**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL BENTLEY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:13-CV-4238-P (BH)** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff, Michael Bentley's Original Brief,* filed March 7, 2014 (doc. 20) and *Defendant's Response Brief*, filed April 4, 2014 (doc. 26). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED.**

## I.  BACKGROUND

### A.      <u>Procedural History</u>

Michael Bentley (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability income benefits (DIB) under Title II of the Social Security Act and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  On October 25, 2010, Plaintiff applied for SSI and DIB, alleging disability beginning on January 19, 2008, due to psoriasis and arthritis.  (R. at 154-160, 161-166, 203.)[1]  His

---

[1]The background information is summarized from the record of the administrative proceedings, which is designated as "R."

request was denied initially and upon reconsideration.  (R. at 1-6, 97-98.)  Plaintiff requested a

hearing before an Administrative Law Judge (ALJ), and he personally appeared and testified at a

hearing on May 1, 2012.  (R. at 16-50,111-116.)  On June 20, 2012, the ALJ issued his decision

finding Plaintiff not disabled. (R. at 57-72.)  Plaintiff requested review of the ALJ's decision, and

the Appeals Council denied his request on September 5, 2013.  (R. at 1-3, 14-15.)  Plaintiff timely

appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* R. at 1-2.)

**B.**     **Factual History**

**1.**     **Age, Education, and Work Experience**

Plaintiff was born on January 23, 1972, and he was 41 years old at the time of the hearing

before the ALJ.  (R. at 154, 161, 198; *see* R. at 16.)  He has a high school degree and a certificate

in automotive technology.  (R. at 22, 65.)  He has past relevant work as a grinder operator, a hand

packager, a forklift operator, a warehouse worker, and a glass production worker.  (R. at 45, 65.)

**2.**     **Medical Evidence**

On October 23, 2005, Plaintiff received imaging of his right wrist due to a sprain.  (R. at

337.)  Clinton Brunson, a radiologist, noted that there appeared to be soft tissue swelling involving

the base of his thumb, but not "bony abnormality."  (*Id*.)  On October 30, 2005, Plaintiff saw Dr.

Robert Silverman at Ellis Co. Medical Associates PA, for a follow-up examination regarding the

sprain of his right wrist.  (R. at 335.)  Dr. Silverman noted that the wrist sprain was improved, and

Plaintiff had full range of motion and no tenderness.  (*Id.*)

On February 24, 2007, Plaintiff presented to Quality Care Medical Group for psoriasis

arthritis to see Dr. Paul Michiels.  (R. at 435.)  Plaintiff reported that his psoriasis, which he

developed at the age of 12, was not well controlled at that time.  (*Id*.)  His psoriasis arthritis

developed predominantly with symptoms of pain and stiffness in both knees and in the fingers of both hands.  (*Id*.)  He denied any joint swelling.  (*Id*.)  He was able to ambulate and claimed that he could walk a mile if needed, although slowly and with knee pain.  (*Id*.)  He was able to do most things he needed to with his fingers, but grasping caused him pain.  (*Id*.)  His biggest orthopedic change due to the arthritis was his inability to completely extend the small finger on both hands.  (*Id*.)  Plaintiff was taking Tylenol and the experimental drug, Cephalon-701.  (*Id*.)  Dr. Michiels noted that Plaintiff was able to get on and off the examination table without difficulty.  (R. at 436.)  A physical exam indicated that Plaintiff had normal gait and station, had no signs of ataxia or unsteadiness, had no joint tenderness, and was able to stand on his heels and toes, bend all the way over, and squat all the way down with no difficulty.  (*Id*.)  An inspection of his skin revealed that he had typical plaque psoriasis rash on his arms, legs, and trunk, both anterior and posterior.  (*Id*.)  Dr. Michiels assessed psoriasis and psoriasis arthritis with knee and hand involvement.  (R. at 437.)  An MRI of Plaintiff's left knee revealed that it was normal with no joint space narrowing or effusion.  (R. at 439.)

On March 12, 2007, Kavitha Reddy, a state agency medical consultant (SAMC), completed a Case Assessment for Plaintiff.  (R. at 442.)  She found that Plaintiff had a medically determinable impairment of psoriasis that was non-severe.  (*Id*.)  She noted that Plaintiff had "decreased function [in] right[] [a]nd left 5th fingers, rest of exam normal strength, [range of motion], and neuro."  (*Id*.)  She also noted that the alleged limitations caused by Plaintiff's symptoms were not fully supported by the medical evidence of record or other evidence.  (*Id*.)

On May 15, 2009, Plaintiff presented to Dr. Martin Menter at Texas Dermatology Associates, P.A. (Texas Dermatology) to discuss his psoriasis as well as the benefits, risks, and

options for biologic medications.  (R. at 658.) A physical exam revealed that Plaintiff's body was "clear." (*Id.*)   Dr. Menter noted that he was on compassionate Humira. (*Id.*)  Plaintiff returned to Dr. Menter on May 19, 2009, complaining of pain in his shoulder, wrists and fingers due to psoriasis.  (R. at 659.)  A physical exam revealed he had a single "pap" on his left elbow.  (*Id.*)

Plaintiff followed up with Dr. Menter on January 4, 2010, who noted that Plaintiff was taking Zyrtec. (R. at 655.)  He also noted that Plaintiff's psoriasis was all clear and doing great, although his joints were a little sore in the wrists.  (R. at 565.)  He stressed gentle skin care and advised Plaintiff to avoid natural sunlight and wear sun screen and hats to protect his face and scalp.  (*Id.*)

On April 12, 2010, Plaintiff saw Cynthia Trickett, a physician assistant at Texas Dermatology.  (R. at 652.)  He reported that he was tolerating his medication.  (R. at 653.)  A physical exam revealed that his joints and hands hurt.  (R. at 653-54.)  Ms. Trickett noted that Plaintiff's psoriasis was "basically clear," but it appeared on his joints and hands "every now and then." (R. at 653.)  He was tolerating his medication okay.  (*Id.*)  She also noted that he presented with marked impairments in the activities of daily living due to medical limitations imposed by psoriasis, which was basically clear and mainly affected his joints.  (R. at 654.)

On August 12, 2010, Plaintiff reported to Dr. Menter that his skin remained clear, but his joints had been hurting more, especially in the morning or after sitting for long periods of time.  (R. at 650.)  His knees and hands were the worst.  (*Id.*)  Physical examination revealed that the fifth digit of his left hand had "pip fusion" but was not currently tender or erythematous, and his knees were tender bilaterally to palpation but were not swollen.  (R. at 652.)  Dr. Menter noted that Plaintiff presented with marked impairments in the activities of daily living due to the medical limitations imposed by psoriasis, and that aggressive treatment was necessary to improve his life and ability to

function. (*Id*.)  He prescribed folic acid and Methotrexate sodium injections.  (*Id*.)

On September 23, 2010, Plaintiff reported that his psoriasis might be slightly better, but he still had issues with his joints and wrist and knee stiffness.  (R. at 648.)  Physical examination revealed "pip" on his back, warty paps on his elbow, and no tenderness to palpation on his joints. (R. at 650.)  Dr. Menter again noted that Plaintiff presented with marked impairments in the activities of daily living due to the medical limitations imposed by psoriasis, and that aggressive treatment was necessary to improve his life and ability to function.  (*Id*.)  He had a lengthy discussion with him regarding the use of systematic medications, and he advised him to return to see him in four months.  (*Id*.)

Plaintiff returned on January 19, 2011.  (R. at 646.)  He reported that his psoriasis was good but he was still having issues with his joints as well as stiffness in the hands and knees, mainly in the morning and evening.  (*Id*.)  A physical exam revealed "pip" on his back, warty paps on his elbow, and significant tenderness in his wrist and the fifth digit on his right hand.  (R. at 647.)  Dr. Menter once again noted that Plaintiff presented with marked impairments in the activities of daily living due to the medical limitations imposed by psoriasis, and that aggressive treatment was necessary to improve his life and ability to function.  (R. at 648.)  He recommended that Plaintiff take two Aleve pills in the morning in addition to his other medications.  (*Id*.)

On January 27, 2011, Dr. Silverman examined Plaintiff at the request of the Social Security Administration. (R. at 558.)  Plaintiff reported that he developed psoriasis at approximately age 12 or 13, and he was initially treated with topical agents which proved unsuccessful.  (*Id*.)  He was eventually referred to a psoriasis expert, who had been treating him for the past 15 to 20 years.  (*Id*.)  He had been on several remittive drugs, and he had been on Humira for the past two years and

Methotrexate injections for the past 6 to 8 months.  (*Id.*)  He had markedly improved with the Humira and Methotrexate injections, and his skin lesions had almost disappeared.  (*Id.*)  Dr. Silverman found that Plaintiff had "what may represent psoriatic arthritis."  (*Id.*)  He noted that Dr. Menter had been treating the arthritis with Aleve, which had helped somewhat.  (*Id.*)  Plaintiff reported that the major joints involved were his left wrist, left knee, and left ankle.  (*Id.*)  He had not noticed swelling, but he had significant pain.  (*Id.*)  He was able to sit for approximately 1 hour before his knees started hurting, stand for approximately 2 hours, and walk approximately 1 block.  (*Id.*)  He had never been evaluated by a rheumatologist.  (*Id.*)

A review of systems revealed that Plaintiff was remarkable for what was "mentioned above", and Dr. Silverman noted that Plaintiff had frequent headaches, dizziness, anxiety, and seasonal allergies.  (R. at 559.)  A physical exam revealed that there was a faint plaque on his right elbow, his left wrist and left knee had full range of motion with no swelling, his left ankle had slight decreased range of motion with mild swelling, and there was no warmth or redness, or other joint abnormalities.  (R. at 559-60.)  Dr. Silverman found that Plaintiff walked with a slightly antalgic gait, and he was able to heel-walk and toe-walk with discomfort due to ankle pain.  (R. at 560.)  He assessed that Plaintiff had psoriasis, and he determined that Plaintiff's skin legions were well-controlled with combination therapy.  (*Id.*)  Dr. Silverman was unclear whether his joint pain was a manifestation of psoriatic arthritis.  (*Id.*)  Plaintiff had not had a definitive diagnostic evaluation of his joint pain, and "prognosis was guarded."  (*Id.*)

On March 3, 2011, Dr. Andrea Fritz, a SAMC, completed a physical RFC assessment for Plaintiff.  (R. at 561-568.)  She noted a primary diagnosis of psoriatic arthritis.  (R. at 561.)  She opined that Plaintiff had the physical residual functional capacity (RFC) to lift and carry 20 pounds

occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight with hand and/or foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; with no manipulative, visual, communicative, or environmental limitations. (R. at 562-65.) Dr. Fritz noted that medical evidence of record was available from May 2009, and it showed chronic care for psoriasis with Humira and Methotrexate. (R. at 568.) She referenced the September 23, 2010 medical report, which noted no complaints upon a review of symptoms, "PIP" on Plaintiff's back, warty paps on elbows and joints, and no "ttp". (R. at 568.) She also noted that Dr. Menter discouraged long use of systematic medications, that Plaintiff had marked impairments in the activities of daily living due to medical limitations imposed by psoriasis, and that he needed aggressive treatment. (*Id.*) Finally, she referenced Dr. Silverman's January 27, 2011 treatment notes, highlighting the notation that a review of systems revealed significant pain in major joints which presented limitations but no swelling; Plaintiff could sit for 1 hour, stand approximately 2 hours, and walk 1 block; his left wrist and left knee had full range of motion and no swelling; his left ankle had a slightly decreased range of motion with mild swelling; and he had a slightly antalgic gait and was able to heel/toe with discomfort due to ankle pain. (*Id.*)

On April 20, 2011, Plaintiff followed up with Dr. Menter regarding his psoriasis. (R. at 644.) Dr. Menter noted that his psoriasis was doing great and was all clear, although his joints and hands seemed to flare with the weather. (*Id.*) A total body skin exam revealed "PIP" in the back, tenderness to hands and joints, and staining on the upper extremity. (R. at 645.)

On June 17, 2011, Dr. Randal Reid, a SAMC, completed a Case Assessment for

reconsideration of the March 4, 2011 RFC assessment.  (R. at 704.)  Based upon all the evidence in the file, he reaffirmed the RFC.  (*Id*.)

On August 17, 2011, Plaintiff returned to Dr. Menter for a follow-up examination.  (R. at 748.)  Plaintiff reported that he had no side effects from his medications, and he had joint symptoms in his hands and feet.  (*Id*.)  Physical examination revealed "PIP" on Plaintiff's hands and arms and a single warty plaque on his right elbow.  (*Id*.)

On October 19, 2011, at Dr. Menter's referral, Plaintiff presented to Dr. Mariangeli Arroyo, an internal medicine doctor at Baylor University Medical Center Outpatient Clinic, for evaluation of elevated creatinine in his blood.  (R. at 825.)  She found that his psoriasis was under control with the Humira and Methotrexate injections, and his main issue was polyarticular arthritis that was secondary to psoriatic arthritis, although no clear diagnosis had been made.  (*Id*.)  She noted that Plaintiff was a well-appearing male, and he had psoriatic patches but not rashes. (R. at 826.)  She found that his arthritis was well controlled with Aleve and recommended that he continue to take it as long as it provided pain relief.  (*Id*.)

On November 17, 2011, Dr. Menter noted that Plaintiff's psoriasis was clear.  (R. at 744.) His joints, hands, and feet were still painful, but they were not tender and functioned normally.  (R. at 744-45.)  Plaintiff was not sure if the increase in the Methotrexate had helped.  (R. at 744.)  A physical exam revealed "PIP" on his hands and arms, "tiny papa L 3rd MCP," and that his skin was otherwise "clear."  (R. at 745.)

He returned to Dr. Arroyo on November 24, 2011 for a follow up examination.  (R. at 822.) Plaintiff reported that he currently felt well, and his main complaint was polyarticular arthritis, which was worse in the right hand joints due to a fall he had the week before.  (*Id*.)  His pain was

getting better and was well controlled with Aleve in the morning and occasionally Tylenol in the evening.  (*Id*.)  Dr. Arroyo noted small psoriatic plaques on his bilateral elbows, but no patches or rashes anywhere.  (R. at 823.)  She again found that his arthritis was well controlled with Aleve. (*Id*.)

### 3.      Hearing Testimony

On May 1, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 16-50.)  Plaintiff was represented by an attorney.  (R. at 18.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that he lived with his stepmother at 1313 Ann Arbor Drive, Corsiscana, Texas, 75110.  (R. at 21.)  He was about 5 feet 8 inches tall, 180 pounds, right-handed, and single with no children.  (R. at 21-22.)

Plaintiff had not had a driver's license since 2006 or 2007, because it was suspended for "driving while license suspended" or for no insurance, and his brother drove him to the hearing. (*Id*.)  He earned some college credits and had a certificate in automotive technology.  (R. at 22.)

His stepmother supported him at the time because he earned no income and received no state benefits or support such as food stamps.  (R. at 22-23.)  He last worked as a temporary laborer for the water district.  (R. at 23.)  He ground and painted the gates on a dam, and he did "weed-eating and stuff."  (*Id*.)  That job ended in January 2008 because Plaintiff's eyes became irritated and red from the "grinding and stuff."  (*Id*.)  Both of his wrists and hands hurt all the time, which interfered with him working.  (*Id*.)

He gave himself Methotrexate injections once a week.  (*Id*.)  He took Humira, folic acid tablets, Simivastin for cholesterol, over-the-counter Aleve for pain, and over-the-counter Zyrtec for

allergies.  (*Id*.)  He took all his medication as prescribed, and the Humira or the Methotrexate injections gave him nausea.  (R. at 25-26.)  The folic acid was supposed to relieve the side effects of the Methotrexate, but he still had a few side effects.  (R. at 26.)

Plaintiff had a few plaques from his psoriasis, about 1 to 3 percent.  (*Id*.)  The medications helped with the joint pain at first, but he didn't think they were helping him as much as before.  (R. at 26-27.)  He could probably grab hold of a cup of coffee and carry it around, but he lost his grip every now and then.  (*Id*.)  Both of his hands were affected equally by his psoriasis.  (*Id.*)  Although he could hold a pen to write, his hand would start cramping if he had to "write a two-page report or something."  (*Id*.)  When he did "yard work and stuff," his psoriasis hurt more the next day, and he got tired.  (R. at 27-28.)  He was not sure if it was from being outside or from having his hands closed around the "handlebar."  (R. at 28.)  He helped out with general household duties; sometimes he had problems doing housework and sometimes he did not.  (*Id*.)  He had trouble getting down on his knees to clean the bathtub and the toilet.  (*Id*.)  He occasionally cooked "something easy" such as spaghetti.  (*Id*.)  He got about an hour or two of sleep at night, and he was always tired.  (*Id*.)  He thought one of his medications caused him to feel drowsy.  (R. at 29.)  He usually took one nap a day around 1 o'clock p.m., which could last from 30 minutes to 2 hours.  (*Id*.)  He believed the nap was also a side effect of his medication.  (*Id*.)

He did most of the grocery shopping.  (*Id*.)  In his free time, he fished and participated in ham radio.  (*Id*.)  He held an extra class license, and he was a certified storm spotter.  (R. at 30.)  He did not, however, get in his car and chase tornadoes.  (*Id*.)  His friend would take him out to the lake to fish from his boat for about an hour or two once or twice a month.  (R. at 30-31.)

Plaintiff was a director in his ham radio club, and his club had meetings once a month.  (R.

at 31.)  He did not have other social activities or do any kind of volunteer work.  (*Id.*)  The other family members that he saw besides his stepmother were his brother and his mother.  (R. at 31-32.)  He went to McDonald's every day, and he went to the library and "stuff like that."  (R. at 32.)  He smoked cigarettes, but he did not drink alcohol or use any drugs that were not prescribed to him.  (*Id.*)  He had been living with his stepmother since about 2007 or 2008.  (*Id.*)

He was convicted for "driving while license suspended" for driving without car insurance, and he did not know he was supposed to pay $260 for three years.  (R. at 33.)  He also had a drug paraphernalia charge in 2006 or 2007, for which he received probation.  (R. at 33-34.)  He claimed the paraphernalia was not really his; he had given someone a ride.  (R. at 33.)

The arthritis in his joints affected his standing and his walking.  (R. at 34.)  He could stand for 30-45 minutes before taking a break, and standing caused his feet, ankles, and knees to hurt.  (*Id.*)  His left knee hurt more than the right.  (R. at 35.)  He did not wear any kind of knee or ankle brace.  (R. at 34.)  He could lift weights, such as a bag of groceries, for short distances, but he could barely lift a 45-pound bag of dog food into his grocery basket before his hands started slipping.  (R. at 35.)

He saw Dr. Menter about every two to three months.  (R. at 36.)  Dr. Menter referred him to Dr. Arroyo, whom he had seen as well.  (*Id.*)  His attorney noted that his records showed that his kidney functions were a little high, and Plaintiff was told to minimize some of his "anti-inflammatory use" of medications.  (*Id.*)  Plaintiff reported that his doctors weren't doing anything else for his kidneys and were just going to "try to watch."  (*Id.*)  Dr. Arroyo put him on Simivastin to control his cholesterol because his dad had passed away recently from a couple of strokes.  (*Id.*)  Plaintiff did not have any joint problems due to his arthritis other than in his ankles, knees, and

11

wrists.  (R. at 37.)

During the hearing, Plaintiff held up his hands for the judge to observe that both his pinkies were permanently crooked at an angle exceeding 90 degrees.  (R. at 38.)  Plaintiff stated that he could move them, but not at the joint, and he could not grasp with them. (R. at 37.)  His middle fingers were his strongest fingers.  (R. at 37-38.)

He had trouble reeling in a fish, and his friend had to help him.  (R. at 38.)  He was sometimes unable to talk long periods on his ham radio because "he [couldn't] key the mic for very good sometimes."  (*Id*.)  When his hands hurt, he had to rest his hands after about "30 minutes or so" before he could go back to grabbing, reaching, or carrying with them.  (R. at 38-39.)  He had to take periods of rest in between using his hands every day.  (R. at 39.)  He spent about 4 to 6 hours a day resting his hands because it caused him pain to move them.  (*Id*.)

His left ankle hurt every day, and he limped off of it.  (R. at 40.)  He was able to walk at a normal pace despite the limp, although he sometimes walked faster than other times depending on how much the ankle hurt.  (R. at 40-41.)  If he tried to kneel down on his knees, he needed to use a table or something similar to get back up.  (R. at 41.)

At one point, before he started taking Humira or receiving Methotrexate injections, about 80 percent of his body was covered in skin plaques.  (*Id*.)  Dr. Menter had several discussions with him regarding the side effects of his medications because they could be serious when used over long periods of time.  (R. at 42.)  Kidney damage, liver damage, and heart and lung problems were side effects of the medications, and therefore Plaintiff took lab tests to ensure the medications were not affecting up his bodily systems.  (*Id*.)  Humira and the Methotrexate injections were the only drugs that helped him control what was "otherwise an 80 percent possibility of covering [his] body with

psoriasis" other than Remicade, which he tried on an experimental basis.  (R. at 42-43.)  He could

not afford the Remicade because there is no drug participation program for it.  (R. at 43.)  He did

not have insurance, and most of his medical care was private pay.  (*Id*.)  The Humira was provided

through Abbott Patient Assistance Foundation (Abbott), and the Methotrexate was provided through

a pharmacy in Louisiana.  (R. at 43-44.)  Without Abbott, the pharmacy, and his mother and

stepmother, he would not be able to afford the medications.  (R. at 44.)

Plaintiff was able to do tasks such as mowing the lawn for about 15 minutes at a time, but

was not necessarily able to complete them.  (*Id*.)  At times, his concentration was affected by his

pain levels, such as when he did emergency work with storm spotters.  (*Id*.)  When the pain got too

bad, he would have to stop what he was doing instead of relaying messages.  (*Id*.)

### b.    VE's Testimony

The VE classified Plaintiff's past relevant work as a grinder operator (heavy, SVP is 5), a

hand packager (medium, SVP is 2), a forklift operator (medium, SVP is 3), a warehouse worker

(medium, SVP is 2), and a glass production worker (medium, SVP is 2).  (R. at 45.)

The ALJ asked the VE to opine whether a hypothetical person of the same age, education,

and work background could perform Plaintiff's past relevant work if he was limited to exertional

demands; could sit, stand, or walk up to 6 hours per workday, with standing or walking limited to

45 minute intervals; no operation of foot controls; no climbing or crawling; frequently balance or

stoop; occasionally kneel or crouch; frequently handle and finger bilaterally; limited to indoors;

avoiding exposure to extremes of heat, cold, dampness or humidity and avoiding direct sunlight;

avoiding exposure to chemicals or other irritants such as fumes, odors, dust, gases or poorly-

ventilated areas. (R. at 46.)  According to the VE, those limitations would preclude Plaintiff's past

relevant work.  (*Id.*)

When asked by the ALJ whether she was able to identify any other jobs in the regional or national economy, the VE identified a counter clerk (light, SVP is 2), with 1,700 jobs in Texas and 18,500 nationally; an information clerk (light, SVP is 2), with 2,200 jobs in Texas and 45,000 nationally; and a ticket taker (light, SVP is 2), with 1,900 jobs in Texas and 25,000 nationally.  (R. at 46-47.)

After the ALJ modified the hypothetical to limit "handling and fingering" to only occasionally instead of frequently, the VE testified that the counter clerk position was the only light job remaining.  (R. at 47.)  However, the VE identified the following sedentary jobs that would be available with the additional limitation: a call-out operator (sedentary, SVP is 2), with 900 jobs in Texas and 24,000 nationally and a surveillance system monitor (sedentary, SVP is 2), with 750 jobs in Texas and 8,000 nationally.  (*Id.*)

The VE testified that none of those jobs would allow for an unscheduled work break of 30 minutes to an hour.  (*Id.*)  When asked by Plaintiff's attorney whether a person's appearance with the psoriasis plaques over 80 or even 50 percent of his body would restrict him from public contact, the VE testified that it would.  (R. at 46-47.)  She also testified that it would eliminate the counter clerk job.  (R. at 47.)

Finally, the VE testified that none of the jobs she mentioned would allow for a one-hour nap in the middle of the day.  (R. at 48-49.)

C.     **The ALJ's Findings**

The ALJ issued her decision denying benefits on June 20, 2012.  (R. at 60-67.)  At step one,[2]

---

[2]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

she found that Plaintiff had not engaged in substantial gainful activity since January 19, 2008, the alleged onset date. (R. at 62.) At step two, she found that Plaintiff had two severe impairments: psoriasis and psoriatic arthritis. (*Id*.) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Next, the ALJ determined that Plaintiff had the following RFC: lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk 45 minutes at a time and up to 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; never operate food controls, climb, and crawl; balance and stoop frequently; kneel and crouch occasionally; handle and finger bilaterally frequently; avoid extremes of heat, cold, dampness, or humidity; work indoors avoiding direct sunlight and chemicals or other irritants. (R. at 63.) At step four, based on the VE's testimony, the ALJ found that Plaintiff was unable to perform his past relevant work. (R. at 65.) Based on the VE's testimony, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 66.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from January 2008, through the date of her decision. (*Id*.)

## II. ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   *Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*. at 436 and n.1.

### 2.    *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

 The Commissioner utilizes a sequential five-step analysis to determine whether a

claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)).  Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    **Issues for Review**

Plaintiff presents three issues for review:

(1)    The ALJ dismissed the treating physician's opinion without reason, thus failing to comply with procedures in SSR 96-5 or 20 C.F.R. §§ 404.1527(d) and 416.927(d), and failed to indicate what substantial evidence supported her cursory conclusions.

(2)    The ALJ should have obtained an updated medical expert op[i]nion of the evidence that was submitted after the SSA agency review or had a medical expert at the hearing, as *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), requires that an ALJ attempt to order more records before finding a treating physician's opinion to be unsupported.

(3)    The ALJ[]'s residual functional capacity assessment was not supported by substantial evidence, as required by SSR 96-8p, SSR 96-9p, and *Myers v. Apfel*, 238 F.3[d] 617 (5th Cir. 2001).

**C.**    **Medical Opinion Evidence**

*1.*    *Treating Physician Rule*

Plaintiff first contends that the ALJ dismissed his treating physician's opinion without considering the various factors set forth in 20 C.F.R. §§ 404.1527(d)[3] and 416.927(d).  (doc. 20 at 6-9.)

---

[3]The relevant factors are now set forth in 20 C.F.R. §§ 404.1527(c).

18

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by

medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56.

Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, in assessing Plaintiff's RFC during the period at issue, the ALJ stated that she considered Dr. Menter's statements that Plaintiff's activities of daily living were markedly limited and whether those statements (the ADL Statements) should be given controlling weight. (R. at 65.) She determined, however, that his treatment records indicated that the ADL Statements were made to assist Plaintiff with obtaining medication on a compassionate basis, and the treatment notes showed that Plaintiff had done well with medication, with only limited symptoms reported or observed to date. (*Id.*)

The ALJ also took into account Plaintiff's testimony regarding his symptoms and the extent to which they affected his functioning. (R. at 63-64.) After careful consideration of the evidence, however, she determined that they were not credible to the extent they were inconsistent with the RFC. (R. at 64.) She acknowledged Plaintiff's long-standing history of psoriasis and the fact that

he developed increased symptoms in 2008, when his participation in an Eli Lily drug trial ended and he was forced to return to using compassionate Humira due to financial constraints. (R. at 64.)  She noted that Plaintiff had joint pain, but the evidence showed that with the regular use of Humira, he had no exercise intolerance or fatigue through April 2010.  (*Id.*)  In August 2010, however, physical examination revealed increased knee and hand pain but no swelling, and he had "fusion of the left fifth digit PIP joint."  (*Id.*)

She next discussed Dr. Silverman's January 27, 2011 findings and found that his examination revealed at most a slight decline in Plaintiff's overall function since his consultative examination with Dr. Michiels in February 2007.  (*Id.*)  The ALJ noted that the psoriasis plaque that was previously on his arms, legs, and trunk in 2007 was only faintly present on his left elbow when Dr. Silverman examined him in 2011.  (*Id.*)  The ALJ also noted that Plaintiff demonstrated limited range of motion in both "fifth fingers" in 2007, and in 2011, he had mild swelling and slightly diminished range of motion in his left ankle.  (*Id.*)  As a result of that left ankle pain, Plaintiff demonstrated a slightly antalgic gait and discomfort with heel and toe walking in 2011, although he had a normal gait and station with no signs of ataxia or unsteadiness in 2007.  (*Id.*)  The ALJ pointed out that despite that symptomology, Plaintiff estimated that he could stand 2 hours, sit for 1 hour, and walk 1 block.  (*Id.*)  Given the evidence of Plaintiff's condition from 2008 until Dr. Silverman's examination in 2011, the ALJ determined that Plaintiff's alleged degree of pain and functional limitations were not supported by the record. (*Id*)

In making her determination, the ALJ also considered the treatment notes following Dr. Silverman's consultative examination and found that there was no evidence that Plaintiff's condition significantly deteriorated between 2011 and 2012.  (*Id.*)  She noted that during an April 2011

examination, Plaintiff was described as doing well, he denied exercise intolerance, numbness or weakness, he had tenderness in his hands, and his joints seemed to "flare" with the weather. (*Id.*) She considered that despite an increase in Methotextrate in August 2010, when Plaintiff reported an increase in hand and feet joint pain, his November 2011 physical examination revealed that he had no tenderness in his joints, and they functioned normally. (*Id.*) The November 2011 examination also revealed that Plaintiff reported polyarticular arthritis which was worse in his right hand joints after a fall the week before, and that his pain was very well controlled with Aleve and Tylenol. (*Id.*)

Because there was no medical evidence from a treating or examining source controverting Dr. Menter's medical opinions, the ALJ was required to perform the six-factor analysis set forth in 20 C.F.R. § 404.1527(c)(1)-(6) before dismissing the ADL Statements. *See Newton*, 209 F.3d at 453-55. Although the ALJ did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 404.1527(c)(1), she specifically stated that she considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See* R. at 63.) Her opinion reflects that she did consider the factors, as she reviewed Dr. Menter's treatment notes and considered whether the ADL Statements were consistent with those notes and the record as a whole. The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-cv-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *rec. adopted*, 2013 WL 1949858 (N.D.Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-cv-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6.

22

Here, the ALJ's opinion reflects that she properly weighed all the evidence, and her narrative discussion showed that she thoroughly analyzed and took into account the treatment notes during the relevant period, the majority of which were made by Dr. Menter, as well as Dr. Silverman's consultative examination and Plaintiff's testimony at the hearing before the ALJ.  (*See* R. at 63-65.)

Additionally, the record reflects that Dr. Menter made the statements about Plaintiff's activities of daily living at the time he applied to Abbott to receive "compassionate Humira" for Plaintiff.  (*See, e.g.*, R. at 578-609.)  The treatment notes in which the ADL Statements were made were accompanied by correspondence from Abbott regarding the Humira.  (*See* R. at 578-653.)  The ALJ's contention that the ADL Statements were made in connection with Dr. Menter's request for compassionate medication, and that the treatment notes reflect that Plaintiff had only limited symptoms reported and observed with the medication, satisfy her duty under the regulations and constitute "good cause" for affording little or no weight to those statements in her RFC determination.  *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-cv-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart,* No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D.Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion); *see also Hall v. Astrue,* No. 3:11-cv-1713-BH, 2011 WL 1042285, at * 9 (N.D. Tex. March 21, 2011)(finding "[c]ourts have ... relied on medical records noting an improvement with medication to find that the ALJ properly assigned little or no weight to a treating physician's opinions.")(citing

*Zimmerman v. Astrue*, 288 F.App'x 931, 935-36 (5th Cir. 2008)).[4]

### 2.    Prejudice

Even assuming that the ALJ erred in failing to give the ADL Statements controlling weight, the error was harmless and Plaintiff has not shown prejudice from it.  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F.Supp.2d 811 (E.D.Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  As outlined below, the treatment notes from Dr. Menter and Dr. Arroyo, which were made after Dr. Menter made the ADL Statements, reveal that Plaintiff's arthritis was under control with an Aleve regime recommended by Dr. Menter, he was functional, and his psoriasis was clear.  They appear to reflect that Plaintiff's conditions improved following Dr. Menter's statements as a result of the recommended Aleve regime, the other medications, or otherwise.  Given the ALJ's consideration of those specific treatment notes, her RFC assessment would likely not have been different even if she had given controlling weight to the ADL Statements.

### D.    Duty to Develop the Record

Plaintiff next argues that the ALJ should have obtained an updated medical opinion from a medical expert or had a medical expert testify at the hearing before the ALJ because the medical opinions that the ALJ relied on were outdated.  (doc. 20 at 9-10.)  He also argues that the ALJ should

---

[4]The Commissioner argues that the ADL Statements were not medical opinions under the regulations, and the ALJ was therefore not required to evaluated them as such. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [one's] impairment(s), including [one's] symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and [one's] physical or mental restrictions." Because ADL Statements reflect Dr. Menter's judgment about the nature of Plaintiff's impairments and his physical restrictions, the statements constitute medical opinions. *See, e.g., Dowe v. Colvin*, No. 3:12-cv-2039-M, 2013 WL 5434641, at *11-12(N.D.Tex. Sept. 30, 2013)(finding the ALJ erred in not performing the six-factor analysis of 20 C.F.R. § 1527 (c) regarding the physician's statements that the claimant was markedly limited in his activities of daily living and maintaining social functioning.)

have requested a response from Dr. Menter before disregarding the ADL Statements. (*Id.* at 10.)

The ALJ has a duty "to develop the facts full and fairly relating to an applicant's claim for disability benefits." *Ripley v. Charter*, 67 F.3d 552, 557 (5th Cir. 1995). When he fails in that duty, he does not have sufficient facts on which to make an informed decision, and his decision is therefore not supported by substantive evidence. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989)(citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). An ALJ is required to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Conway v. Astrue*, No. 3:07-cv-0906-BD, 2008 WL 4865549, at *4 (N.D.Tex. Nov. 10, 2008)(quoting *Kane*, 731 F.3d at 1220.). However, the duty to obtain medical records generally belongs to the claimant. *See Gonzalez v. Barnhart*, 51 Fed. App'x 484, 2002 WL 31319423, at *1 (5th Cir. Oct. 4, 2002); *Hawkins*, 2011 WL 1107205, at *7.

Under the social security regulations, an ALJ is required to re-contact a medical source only "[w]hen the evidence ... from [the] treating physician or psychologist or other medical source is inadequate for [the Commissioner] to determine whether [the claimant is] disabled." *Cornett v. Astrue*, 261 Fed. App'x 644, 648 (5th Cir. Jan. 3, 2008)(*quoting* 20 C.F.R. § 416.912(e)). As to a treating physician specifically, if the Commissioner determines that a treating physician's records are inconclusive or are otherwise inadequate to receive controlling weight, absent other medical opinion evidence by an examining or treating physician, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e). *Newton*, 209 F.3d at 457.

### 1.      *Updated medical opinion*

Plaintiff argues that according to Social Security Ruling (SSR) 96-6p, the ALJ should have

obtained an updated medical opinion from a medical expert, which could have modified Dr. Fritz

and Dr. Reid's (the SAMCs) findings when additional information was submitted to the Social

Security Administration.  (doc. 20 at 9.)   Plaintiff contends that the ALJ's RFC determination was

based on her own medical opinions or "the outdated assessment of Dr. Fritz, who had not had the

advantage of the additional medical evidence filed into the record after her assessment." (*Id*. at 10.)

SSR 96-6p "requires the ALJ to obtain an updated medical opinion from a medical expert

as to the issue of equivalency only in the following two circumstances: (1) if the ALJ concludes that

the claimant does not meet the specific criteria outlined in the Listing [of Impairments] but

reasonably believes claimant's impairments may be judged equivalent, or (2) the ALJ receives

additional medical evidence that he believes may change the state agency medical or psychological

consultant's findings that the impairments are not equivalent in severity to any impairments in the

Listing." *Bailey v. Astrue*, No. 4:08-cv-500-Y, 2009 WL 3614503, at *11 (N.D.Tex. Nov. 2,

2009)(citing SSR 96-6p, 1996 WL 374180, at *4).[5]  Accordingly, SSR 96-6p does not address

whether an ALJ is entitled to request an updated medical opinion regarding an RFC or the effects

of a claimant's impairments on his ability to work when an ALJ relies on medical opinions that

predate some of the medical evidence in the record.  Plaintiff fails to cite any law supporting his

contention that the ALJ was required to order more records or seek an updated medical opinion

because the latest RFC assessment predated some of the medical evidence in the record.

---

[5]Even if SSR 96-6p were applicable, the ALJ's findings do not indicate that she reasonable believed
Plaintiff's impairments might be judged equivalent or that additional medical evidence regarding Plaintiff's
impairments might change any medical findings that Plaintiff's impairments were not medically equivalent to any
impairment in the Listing of Impairments. *See Bailey*, 2009 WL 3614503, at *12 (finding the ALJ was not required
to get an updated medical opinion on the issue of equivalency to address the time period after the SAMC's opinion
as to equivalency where the ALJ's opinion and the record indicated that the ALJ did not believe the claimant's
impairments might be judged equivalent or that additional medical evidence regarding the claimant's impairments
might change the SAMC's findings that such impairments were not medically equivalent to any impairments in the
Listing).

In any event, the ALJ had sufficient evidence before her from the record to make a determination as to Plaintiff's RFC.  As outlined above, her narrative discussion showed that she thoroughly reviewed the record and used it to make her RFC determination.  (*See* R. at 63-65.)  Dr. Fritz completed her RFC assessment on March 3, 2011, and based on the evidence in the file, Dr. Reid confirmed the RFC assessment on June 17, 2011.  (R. at 561-68, 704.)  After Dr. Reid's assessment, there were only four additional medical visits with accompanying treatment notes documented - the August 17, 2011 and November 17, 2011 visits with Dr. Menter, and the October 19, 2011 and November 14, 2011 visits with Dr. Arroyo.  (*See* R. at 748-826.)  Those records showed that Plaintiff's psoriasis and psoriatic arthritis had gotten better since prior visits.  (*See id.*) On January 19, 2011, Dr. Menter noted for the last time in the record that Plaintiff "presented with marked impairment in the activities of daily living due to the medical limitations imposed by psoriasis, and that aggressive treatment was necessary to improve his life and ability to function." (*See* R. at 648.)  At that time, he recommended that Plaintiff take Aleve.  (*Id.*)  Dr. Arroyo noted on October 19 and November 24 that Plaintiff's arthritis was well controlled with the Aleve.  (R. at 822, 826.)  On November 17, Dr. Menter noted that Plaintiff's psoriasis was clear.  (R. at 744-45.) Accordingly, it appeared that Plaintiff was doing better after the SAMCs' RFC assessments than he was doing before those assessments, possibly due to the Aleve recommended by Dr. Menter. Therefore, an updated RFC assessment or medical opinion would not likely have shown more limitations that those identified by the SAMCs.

Additionally, Plaintiff's attorney did not elicit testimony during the hearing before the ALJ to show that his impairments had worsened or that the effects of his impairments had differed since the date of his last RFC assessment.  She also never requested an updated assessment or medical

opinion at the hearing, although she requested the ALJ consider "opening it back up to the 2007 application that [Plaintiff] originally made, rather than [the attorney's] more recent application" and that the Plaintiff "win" on the basis of the VE's testimony. (R. at 49.) Accordingly, Plaintiff has not demonstrated or shown how an additional medical opinion that took into account the treatment notes from those four additional doctor visits would have led to a different or more favorable decision. *See Roberts v. Colvin*, 946 F.Supp.2d 646, 661 (S.D.Tex. 2013)(finding there was nothing to indicate that an additional consultative exam was required where the claimant's attorney did not elicit testimony from her to show that her impairment worsened since the latest consultative exam, none of the records following the latest consultative exam showed that the claimant's symptoms increased, and the claimant's attorney never requested an updated exam during either of the hearings before the ALJ).

### 2.     *Supplemental information from Dr. Menter*

Plaintiff also argues that according to *Newton*, the ALJ should have attempted to order more records before finding the ADL Statements to be unsupported. (doc. 20 at 9.) He claims that the ALJ did not ask Dr. Menter why he found that Plaintiff had severe problems with his activities of daily living even though she had the power to request post-hearing interrogatories from him. (*Id.* at 10.) He contends that pursuant to *Newton*, he was prejudiced by the ALJ's failure to "request a response" from Dr. Menter. (*Id.* at 10-11.)

There is no indication that the ALJ found the evidence in the record inconclusive or otherwise inadequate to render a decision. *See Cornett,* 261 Fed.App'x at 648; *Newton*, 209 F.3d at 457. Dr. Menter did not simply provide a single statement that was unaccompanied by any other notes or records. Indeed, the ADL Statements were accompanied by treatment notes, and the

28

majority of the treatment notes in the record came from Dr. Menter. The record contained ample other opinion evidence other than the ADL Statements. *See Roberts*, 946 F.Supp.2d at 659 (finding the ALJ did not err by not seeking clarification or additional evidence from the treating physician whose opinion he rejected where the record contained ample other opinion evidence based on personal examination or treatment of the claimant). There is also no indication that Dr. Menter could have provided any additional information that would have been helpful to the ALJ or the SAMCs. Dr. Menter provided several treatment notes dated after he made the ADL Statements, and those treatment notes suggested that Plaintiff's condition had improved. *See Price v. Astrue*, No. 3:09-cv-1275, 2011 WL 888260, at *6 (N.D.Tex. March 11, 2011)(finding the ALJ was not required to re-contact the physicians whose opinions he rejected in order to clarify the record regarding the claimant's inability to work because there was no indication that the ALJ found the evidence inconclusive or inadequate or that the physicians could have provided any additional information that would have been helpful to the claimant); *Taylor v. Astrue*, No. 3:10-cv-1158-O, 2011 WL 4091506, at *6 (N.D.Tex. June 27, 2011), *rec. adopted*, 2011 WL 4091503 (N.D.Tex. June 27, 2011), *aff'd*, 480 Fed. App'x 302 (5th Cir. 2012)(same).

### 3. Prejudice

Moreover, to support a remand based on a failure to fully develop the record, a disability claimant must show that the ALJ's failure to develop the record prejudiced the claimant. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Prejudice is established if a claimant shows that he "could and would have adduced evidence that might have altered the result" reached by the ALJ. *Id.* (citing *Kane*, 731 F.2d at 1220). Plaintiff failed to show what additional evidence might have been forthcoming if the ALJ had taken steps to develop the record by obtaining an additional medical

opinion.  *See Lozoya v. Barnhart*, M-03-192, 2006 WL 2844236, at *10 (S.D.Tex. Sept. 26, 2006).

He also failed to show that Dr. Menter could have provided additional information that would have

been helpful to him.  He only argues that "it clearly would have been better to request a response

rather than to assume."  (doc. 20 at 10.)  Plaintiff has therefore failed to establish prejudice from the

ALJ's failure to seek additional opinions or additional information from Dr. Menter.  *See Roberts*,

946 F.Supp.2d at 661 (finding the claimant did not establish prejudice where she did not demonstrate

that she could or would have adduced evidence that would have changed the ALJ's decision); *Vail*,

2009 WL 4877121, at *6 (finding the claimant failed to establish prejudice where she did not present

any clarification or further opinions from the treating physician or others to support her claim for

benefits); *Lozoya*, 2006 WL 2844236, at *10 (finding the claimant did not show resulting prejudice

where he made no showing of what additional evidence may have been forthcoming if the ALJ had

taken steps to develop the record).

### E.   RFC Determination

Plaintiff argues that the ALJ's RFC was not supported by substantial evidence as required

by SSR 96-8p, SSR 96-9p, and *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001).  He claims that the ALJ

relied heavily on Dr. Fritz's opinion and Dr. Reid's affirmation of her opinion, which were outdated

because they did not review the medical records dated after their assessments.  (doc. 20 at 11-12.)

He contends that the ALJ gave more weight to the opinion of someone who did not examine or treat

Plaintiff and who had incomplete records than to that of the treating physician himself.[6]  (*Id*. at 12.)

---

[6]Plaintiff claims that this is the same result as in *Myers*.  In *Myers*, the ALJ failed to address standing, walking, and pushing/pulling in determining the claimant's RFC, and he failed to set out whether the claimant could perform those demands on a regular and continuing basis (in an 8-hour workday).  238 F.3d at 621.  He also failed to resolve inconsistencies in the record.  *Id*.  Finally, the ALJ failed to present good cause as to why he failed to take into account all of the evidence from the treating doctors.  *Id*.  The Court found that the medical evidence as a whole indicated that claimant could not meet the RFC requirements.  *Id*.  Here, the ALJ has addressed all exertional limitations in her RFC assessment, and she set out whether Plaintiff could perform work-related activities on a

Plaintiff also claims that the ALJ failed to make specific references to the medical records as to how she came to the conclusions regarding Plaintiff's limitations. (*Id.*)

RFC is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for

---

regular and continuing basis. She also addressed the inconsistencies in the record, and as shown below, the medical evidence in the record supports her RFC finding. As shown above, she presented good cause for why she failed to assign controlling weight to the ADL Statements.

evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th

Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever

fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts

may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and

a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible

choices" or "no contrary medical evidence".  *See Johnson*, 864 F.2d at 343 (citations omitted).

The ALJ found that Plaintiff had the RFC to lift/carry 10 pounds frequently and 20 pounds

occasionally; stand/walk 45 minutes at a time and up to 6 hours in an 8-hour workday; sit 6 hours

in an 8-hour workday; never operate food controls, climb, and crawl; balance and stoop frequently;

kneel and crouch occasionally; handle and finger bilaterally frequently; avoid extremes of heat, cold,

dampness, or humidity; work indoors avoiding direct sunlight and chemicals or other irritants.  (R.

at 63.)  As outlined above, in making her determination, she considered Plaintiff's use of Humira

and how his regular use of it affected his symptoms, she considered Dr. Silverman's January 2011

examination and how Plaintiff's symptoms and functions had changed at that time since the onset

of his impairments, and she also considered the change in Plaintiff's condition since 2011 and the

date of Plaintiff's last treatment notes in the record.  Finally, she considered Plaintiff's testimony

and the "entire record," which included the SAMCs' RFC assessments.  (See R. at 63-65.)

The ALJ was entitled to rely on the SAMCs' assessments in making her RFC assessments,

as the assessments were given within the relevant time period.  Plaintiff provides no support for his

contention that the assessments are "outdated" simply because they predated a few records.  The

ALJ considered the medical evidence in the record after the RFC assessments were made and in fact,

as noted above, those records show that Plaintiff was doing better after those assessments than he

was before the assessments.  His psoriasis was clear, his psoriatic arthritis was well controlled with

over-the-counter Aleve, his joints, hands, and knees functioned normally despite pain, and he had

no side effects of his medications.  (*See* 744-75, 748, 822, 826.)  Additionally, as noted by the Fifth

Circuit, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary

conclusion." *Newton*, 209 F.3d at 455.   Therefore, the ALJ was entitled to both reject an opinion

by Dr. Menter if she found that it was not supported by the record and rely on opinions by the

SAMCs. *See Brewer*, 2013 WL 1949842, at *6  (finding although the ALJ rejected the treating

physician's opinion, the ALJ's RFC determination was consistent with the SAMC's RFC

assessment, which constituted substantial evidence to support the ALJ's RFC determination); *see

also Taylor v. Apfel*, 228 F.3d 409, 2000 WL 1056273, at *1 (5th Cir. July 24, 2000)(finding an ALJ

may reject the opinion of *any* physician, including treating physicians, if not supported by the

record).  Further, the SAMCs' RFC assessments were made after the ADL Statements regarding

Plaintiff's activities of daily living, and so they were no more "outdated" than the ADL Statements,

which Plaintiff contends should have been given controlling weight.  Notably, the ALJ's RFC

decision reflects more limitations than that of the SAMCs.  Therefore, she did not blindly adopt their

RFC assessments and took into account the other evidence before her.

Finally, despite Plaintiff's contention otherwise, the ALJ made specific references to the

medical records in her determination of Plaintiff's RFC.  The ALJ noted that her conclusion as to

Plaintiff's lifting/carrying limitations were made as a result of the medical records that indicated

Plaintiff was doing great, his joints functioned normally despite pain, he had no numbness or

weakness, his arthritis was worse in the right hand joints after a fall, and his pain was well controlled

with Aleve. (R. at 65.)  Her conclusions as to Plaintiff's standing/walking limitations were based

on Plaintiff's intermittent reports of foot pain and his demonstration of mildly ataxic gait secondary to left ankle pain.  (*Id*.)  After her consideration of the entire record, she found no evidence that he would be precluded from sitting 6 hours in an 8-hour workday.  (*Id*.)  She expressly considered Plaintiff's combined effects of knee and foot pain to determine that he would be precluded from operating foot controls, climbing, and crawling and to determine his limitations as to balancing, stooping, kneeling, and crouching.  (*Id*.)  The ALJ stated that in determining Plaintiff's handling and fingering limitations, she took into account that the treatment records indicated that Plaintiff's hand pain was controlled with over-the-counter medication to date and did not impose weakness.  (*Id*.)  Finally, she took into account Plaintiff's reported symptoms of exacerbation of pain with changes in weather in her determination of his environmental limitations.  (*Id*.)  Therefore, the ALJ took care to meticulously explain the bases for her RFC determination with references to the record, and the record supports her RFC determinations.   In any event, the ALJ's RFC decision can be supported by substantial evidence even if she did not specifically discuss all the evidence that supported her decision or all the evidence that she rejected.  *See Falco*, 27 F.3d at 164.

Accordingly, the ALJ's RFC determination was supported by substantial evidence.

## III.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 5th day of March, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE